George FABE, Superintendent of Insurance, State of Ohio, Plaintiff–Appellant,

v.

UNITED STATES DEPARTMENT OF the TREASURY; Mitchell A. Levine, Assistant Commissioner, Defendants–Appellees.

No. 90–3364.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 29, 1990.

Decided July 17, 1991.

---

David E. Northrop (argued), James R. Rishel, Gurley, Rishel, Myers & Kopech, Columbus, Ohio, for plaintiff-appellant.

Joseph E. Kane, Asst. U.S. Atty., Columbus, Ohio, J. Christopher Kohn, Sandra P. Spooner (argued), Office of Dept. of Justice, Civil Div., Washington, D.C., for United States Dept. of Treasury.

Joseph E. Kane, Asst. U.S. Atty., Columbus, Ohio, J. Christopher Kohn, Office of the Dept. of Justice, Civil Div., Washington, D.C., for Mitchell A. Levine, Assistant Commissioner.

Before MARTIN and JONES, Circuit Judges, and EDGAR, District Judge.*

* The Honorable R. Allan Edgar, United States District Judge for the Eastern District of Tennessee, sitting by designation.

BOYCE F. MARTIN, Jr., Circuit Judge.

In this declaratory judgment action, the district court found that certain claims of the United States against an insolvent Ohio insurance company are entitled to priority as provided by 31 U.S.C. § 3713 (1988), notwithstanding contrary provisions of Ohio law. Because we find the Ohio insurance liquidation priority scheme at issue to be a regulation of the "business of insurance" within the meaning of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (1988), and thus subject solely to the provisions of state law absent explicitly conflicting federal legislation, we reverse.

The facts of this case are uncontested. On April 30, 1986, the Court of Common Pleas for Franklin County, Ohio declared the American Druggists' Insurance Company insolvent. Pursuant to Ohio Rev.Code § 3903.01 et seq., the court directed that American Druggists' be liquidated and appointed George Fabe, the Superintendent of Insurance for the State of Ohio, to serve as liquidator.

The United States filed claims in the liquidation proceedings as obligee on various immigration, appearance, performance and payment bonds issued by American Druggists' as surety. The United States notified Fabe on August 28, 1986, that it would seek first priority for its claims by virtue of the federal superpriority statute, 31 U.S.C. § 3713(a)(1)(A).[1] Thereafter, Fabe filed for a declaratory judgment in federal district court arguing that the federal superpriority statute does not apply to Ohio's liquidation of American Druggists' because the controlling state priority statute, Ohio Rev.Code § 3903.42, is a regulation of the "business of insurance" within the meaning of the McCarran–Ferguson Act. Accordingly, Fabe argues that § 3903.42 takes precedence over the federal statute, entitling the United States to the lesser priority afforded by state law.

Before the district court, both parties stipulated that Ohio Rev.Code § 3903.42 is a state law which regulates the insurance industry, that application of the federal priority statute would "invalidate, impair, or supercede" the state statute, and that the federal priority statute is not an act which specifically relates to the "business of insurance." *See* McCarran–Ferguson Act, 15 U.S.C. § 1012(b). Therefore, the sole issue presented to both the district court and this court on appeal is whether the Ohio insurance liquidation priority statute is a state law regulating the "business of insurance" within the meaning of the McCarran–Ferguson Act. After a thorough review of relevant precedent, the district court entered judgment for the United States, concluding that Ohio Rev. Code § 3903.42 regulates only the business of insurance companies, not the "business of insurance." *See Securities & Exchange Commission v. National Securities,* 393 U.S. 453, 460, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). As a pure question of law, we consider this issue on appellate review independent of the district court's decision. *Salve Regina College v. Russell,* — U.S. —, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991).

Prior to 1944 the authority to regulate insurance transactions rested exclusively with the several states. *National Securities,* 393 U.S. at 458, 89 S.Ct. at 567 (citing *Paul v. Virginia,* 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357 (1869) (insurance transactions not considered "commerce")). That relationship changed following the Supreme Court's conclusion in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), that insurance transactions are commerce, subject to federal regulation under the Commerce Clause. Because Congress feared injury to the traditional policy of state regulation of the insurance industry, it quickly responded.

1. 31 U.S.C. § 3713 provides, in pertinent part:

(a)(1) A claim of the United States shall be paid first when-
(A) a person indebted to the Government is insolvent and-

(i) a debtor without enough property to pay all debts makes a voluntary assignment of property;
(ii) property of the debtor, if absent, is attached; or
(iii) an act of bankruptcy is committed[.]

Declaring that "the continued regulation and taxation by the several States of the business of insurance is in the public interest[,]" 59 Stat. 33, 15 U.S.C. § 1011, Congress passed the McCarran–Ferguson Act, 15 U.S.C. § 1012, to protect the dominion of the states over the "existing and future ... systems for regulating and taxing the business of insurance." *Prudential Insurance Co. v. Benjamin*, 328 U.S. 408, 429, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342 (1946). The Act provides:

(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance[.] [2]

15 U.S.C. § 1012. Although the Act exempts from federal preemption only those state regulations which concern the "business of insurance," neither the Act nor its legislative history is particularly enlightening as to the meaning of that term. *National Securities*, 393 U.S. at 459, 89 S.Ct. at 568. Accordingly, we turn to the Supreme Court's trilogy of cases construing the "business of insurance" to determine whether that term encompasses the Ohio statute.

The first of these three cases interpreting the "business of insurance" under the McCarran–Ferguson Act is *Securities & Exchange Commission v. National Securities, id.* at 453, 89 S.Ct. at 565. In *National Securities* the Court confronted the issue of whether the Securities & Exchange Commission had the power to regulate the activities of persons engaged in the insurance business. Specifically, the case focused on an Arizona insurance company which made a number of misrepresenta-

tions to shareholders in an attempt to secure their approval for a pending merger. The company sought to avoid prosecution for federal securities violations on the grounds that an Arizona statute aimed at protecting stockholders in domestic insurance companies regulated the "business of insurance," and thus superceded the federal securities act by operation of McCarran–Ferguson. The Supreme Court disagreed.

The Court determined that the Arizona statute was not protected from federal preemption by McCarran–Ferguson because the Act applied only to laws regulating the "business of insurance," not the business of insurance companies. *Id.* at 459, 89 S.Ct. at 568. The Court stated:

Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia* held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement—these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting this relationship, directly or indirectly, are laws regulating the "business of insurance."

*Id.* at 460, 89 S.Ct. at 568. Because the Arizona statute regulated the relationship between shareholder and corporation, rather than insured and insurer, it "is not insurance regulation, but securities regulation[,]" unprotected by McCarran–Ferguson. *Id.* That the Arizona statute applied exclusively to insurance companies is irrelevant:

---

**2.** Several congressional enactments, including the Sherman Act, Clayton Act, and Federal Trade Commission Act, have been amended pursuant to McCarran–Ferguson to provide for con-

tinuing federal dominance in areas of national concern. The federal superpriority statute has not been so amended.

The crucial point is that here the State has focused its attention on stockholder protection; it is not attempting to secure the interests of those purchasing insurance policies. Such regulation is not within the scope of the McCarran–Ferguson Act.

*Id.*

The Court was next called upon to construe the meaning of "business of insurance" in *Group Life & Health Insurance Company v. Royal Drug Company*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). In *Royal Drug* the Court considered whether alleged anticompetitive agreements between an insurance company and several pharmacies were exempt from the federal antitrust laws. Group Life had entered into agreements with certain pharmacies under which those pharmacies agreed to furnish the insurer's policyholders with prescription drugs at the price of two dollars per prescription, while Group Life agreed to reimburse the participating pharmacies for their costs in acquiring the prescription drugs sold. Other non-participating pharmacies sued claiming that such agreements violated the Sherman Anti-Trust Act by fixing the retail price of drugs and by deterring policyholders from dealing with independent retailers. Group Life argued that the agreements were exempt from the antitrust laws as the "business of insurance" regulated by Texas law. Again the Supreme Court disagreed.

The Court began its analysis by noting that central to the definition of the "business of insurance" are "the spreading and underwriting of a policyholder's risk ... [and] the contract between the insurer and the insured." *Id.* at 211, 215, 99 S.Ct. at 1073, 1075. It found the provider agreements at issue served neither goal. The agreements acted simply as separate contractual arrangements for the purchase of goods and services between the insurer and a third party which furnished the insurer with a substantial cost savings. *Id.* at 216, 99 S.Ct. at 1075. They did not, as Group Life argued, affect the " 'reliability, interpretation, and enforcement' of the insurance contract [or] 'relate so closely to their status as reliable insurers' as to fall within

the exempted area." *Id.* To equate cost effectiveness with reliability would be to distort the notion of the "business of insurance" to such a degree that any business decision made by an insurance company to maximize profits and minimize costs would qualify for exemption.

The Court concluded by suggesting that the provider agreements were not made the business of insurance simply because they were subject to state regulation at the time McCarran–Ferguson was enacted. *Id.* at 230 n. 38, 99 S.Ct. at 1082 n. 38.

> [T]he enabling statutes in existence at the time the Act was enacted typically regulated such diverse aspects of the plans as the composition of their boards of directors, when their books and records could be inspected, how they could invest their funds, *when they could liquidate* or merge, as well as how they could purchase goods and services by entering into provider agreements.
>
> Provider agreements are no more the "business of insurance" because they were regulated by state law at the time of the McCarran–Ferguson Act than are these other facets of the plans which were similarly regulated.

*Id.* (emphasis added). Accordingly, the Court found the purpose of McCarran–Ferguson was not to restore the law to the status quo prior to *South–Eastern*, but to protect state regulation only of the "business of insurance." *Id.* at 230, 99 S.Ct. at 1082.

The Court's most recent opinion concerning the "business of insurance" is *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Pireno was a chiropractic practitioner who challenged Union Labor Life's use of a chiropractic peer review committee to make nonbinding recommendations as to whether policyholder claims were "reasonable charges" for "necessary medical care and services," and therefore payable within the coverage limits of the insureds' policies. *Id.* at 122, 102 S.Ct. at 3005. Pireno's methods were criticized by the committee which recommended that Union Labor Life

not pay claims arising from his treatment because both the number of prescribed visits and the cost per treatment were excessive. Pireno sued claiming Union Labor Life's use of the peer review committee was a conspiracy to fix prices and restrain competition in violation of the Sherman Act. The district court granted summary judgment to Union Labor Life on the grounds that use of the peer review committee provided an efficient means of determining the company's obligation in the claims adjustment process, and so was protected from antitrust scrutiny by the McCarran–Ferguson Act. Again, the Supreme Court disagreed.

The Court reviewed its prior decisions and identified a three-part test for determining whether certain conduct is part of the "business of insurance."

> [F]irst, whether the practice has the effect of transferring or spreading a policyholder's risk; *second*, whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third*, whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinate in itself....

*Id.* at 129, 102 S.Ct. at 3008. Applying this test, the Court found the agreement between Union Labor Life and the peer review committee to fail each of the three prongs.

The Court first rejected Union Labor Life's argument that the peer review activity was within the "business of insurance" because it aided the insurer in determining the scope of the risk transferred. The Court found the foundation of this argument, that risks were transferred upon payment, to be contrary to the fundamental tenets of insurance: "The transfer of risk from insured to insurer is effected by means of the contract between the parties-the insurance policy-and that transfer is complete at the time that the contract is entered." *Id.* at 130, 102 S.Ct. at 3009; *See* 9 G. Couch, Cyclopedia of Insurance Law §§ 39:53, 39:63 (2d ed.1962). Though the Court did find the actual claims adjustment process to be within the "business of insur-

ance," the non-binding nature of the committee's recommendations removed it so far from the policy relationship that it could not be said to be central to the risks spread at the time of contracting. *Id.* at 134 n. 8, 102 S.Ct. at 3011 n. 8.

In addressing the second criterion, the Court found it clear that the peer review system was not "an integral part of the policy relationship between insurer and insured." *Id.* at 131, 102 S.Ct. at 3010. Like the provider agreements at issue in *Royal Drug,* the arrangement between Union Labor Life and the peer review committee was a separate and distinct contract between the insurer and a third party non-insurer, with only ancillary impact upon the contract of insurance. Such arrangements are not the "business of insurance," but merely cost savings devices which are immaterial to the policyholder whose only concern is that his claim be paid, not why it is paid. *Id.* at 132, 102 S.Ct. at 3010.

The Court also had little difficulty finding that the challenged peer review activities were not "limited to entities within the insurance industry," because the very nature of the agreement at issue implicated the substantial and direct involvement of third party non-insurers. *Id.* Though "the challenged peer review practices need not be denied the [McCarran–Ferguson] § 2(b) exemption solely because they involve parties outside the insurance industry[,]" it is clear that such third party arrangements which have only an ancillary effect on policy holders were not at the core of Congressional concern during the passage of the McCarran–Ferguson Act. *Id.* at 133, 102 S.Ct. at 3010. Accordingly, the peer review agreements are subject to the provisions of the Sherman Act, because they do not regulate the "business of insurance."

Though *Pireno* is the latest case addressing the meaning of the "business of insurance," its analysis is but a distillation of the earlier cases. We disagree with Fabe's assertion here that *Pireno* and *Royal Drug* are limited to antitrust exemption; given the Supreme Court's use of the *Pireno* analysis in other contexts, we find that argument to be untenable. *See Metropoli-*

*tan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 742–44, 105 S.Ct. 2380, 2390–91, 85 L.Ed.2d 728 (1985) (applying *Pireno* test to define "business of insurance" under ERISA savings clause); *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50–51, 107 S.Ct. 1549, 1554–55, 95 L.Ed.2d 39 (1987) (same). Rather, we find *National Securities* and *Royal Drug* to be of continuing instructive value in the application of *Pireno.* Accordingly, our review of Ohio Rev.Code § 3903.42 will draw from each of these opinions.

The state regulation at issue in this case, Ohio Rev.Code § 3903.42, is part and parcel of a large, complex and specialized administrative system adopted by the State of Ohio to regulate the life of domestic insurance companies from incorporation to dissolution pursuant to McCarran–Ferguson. Ohio Rev.Code § 3901.01 *et. seq.* Chapter 3903 provides a comprehensive scheme for the orderly supervision, rehabilitation, and/or liquidation of Ohio insurance companies. *American Centennial Insurance Corp. v. ARMCO, Inc.,* 746 F.Supp. 350 (S.D.N.Y. 1990). Such regulation is critical to the protection of the insurance consumer because insurance companies are not subject to subrogation in bankruptcy proceedings under chapters seven or eleven of the Federal Bankruptcy Code. 11 U.S.C. § 109 (1979). For this reason, federal courts have often abstained from considering questions regarding state liquidation proceedings in order to protect the state's substantial interests in this regard. *See, e.g., Grimes v. Crown Life Ins. Co,* 857 F.2d 699 (10th Cir.1988), *cert. denied,* 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 934 (1989); *United Services Auto Ass'n v. Muir,* 792 F.2d 356 (3d Cir.1986), *cert. denied sub nom. Grode v. United Services Auto. Ass'n,* 479 U.S. 1031, 107 S.Ct. 875, 93 L.Ed.2d 830 (1987); *Levy v. Lewis,* 635 F.2d 960 (2d Cir.1980); *Washburn v. Corcoran,* 643 F.Supp. 554 (S.D.N.Y.1986). Of course, abstention is inappropriate in this case which presents a direct federal question.

The stated purpose of Chapter 3903 is to provide a coherent policy for the liquidation of insurers for "the protection of the inter-ests of insureds, creditors, and the public generally...." Ohio Rev.Code § 3903.02(D). The district court provided an adequate synopsis of its pertinent provisions:

> The Superintendent of Insurance may file a complaint seeking an order to liquidate an insurer for one of a number of reasons, Ohio Rev.Code § 3903.17, and if the Court of Common Pleas issues an order to liquidate[,] the superintendent is appointed as liquidator and is directed to liquidate the company. Ohio Rev.Code § 3903.18(A). Within such liquidation Ohio Rev.Code § 3903.43 establishes the priorities for payment of claims.

Under § 3903.42, all claims against the liquidated insurance company are placed into classes and prioritized. All claims in each class are to be paid in full before members of subordinate classes may receive any payment. Classes one and two contain the usual provisions for the costs and expenses of administering the scheme, and compensating employees for services performed and benefits accrued. Class three includes "all claims under policies for losses incurred," including policyholders who seek to recover their investments. Class four is limited to the claims of general creditors. Class five provides for any claims filed by federal, state, or local governments.

In the present case, American Druggists' was liquidated pursuant to the Ohio scheme. The United States filed claims in the insolvency proceedings as obligee on various general obligation surety bonds defaulted by American Druggists'. This case does not involve federal claims for taxes due, but merely federal claims against a defaulted surety in which the United States stands in the same position as other bond obligees. However, the United States asserts that, pursuant to the federal superpriority statute, it may leapfrog the claims of other policyholders solely because it is the United States. That argument turns on whether the Ohio liquidation priority statute regulates the "business of insurance."

Before turning our attention to those cases which have considered the issue of whether such priority schemes may be con-

sidered a regulation of the "business of insurance," we must address two arguments made by the United States which it argues are dispositive. The United States first contends that the issue before us was settled by the Supreme Court's 1936 opinion in *United States v. Knott*, 298 U.S. 544, 56 S.Ct. 902, 80 L.Ed. 1321 (1936). It argues that because McCarran–Ferguson "was an attempt to turn back the clock," the Supreme Court's pre–McCarran holding in *Knott*, that a Florida insurance priority law was subject to federal preemption, controls the outcome of the case before us. We disagree with this assertion on two grounds. First, McCarran–Ferguson did not return to the *status quo* prior to *South–Eastern Underwriters;* instead, it only permitted state regulation of the "business of insurance," without federal interference. *Royal Drug*, 440 U.S. at 220 n. 24, 99 S.Ct. at 1078 n. 24. Second, even if it had, the Florida statute at issue in *Knott* contained only generalized provisions protecting domestic creditors in Florida insurance companies over foreign creditors; it in no way regulated the "business of the insurance" for the protection of the insured. *See National Securities*, 393 U.S. at 460, 89 S.Ct. at 568 (where focus is away from the protection of insureds statute does not regulate the "business of insurance").

The United States' second conclusory argument is that footnote 38 of *Royal Drug*, 440 U.S. at 230, 99 S.Ct. at 1082, forecloses plaintiff's claim by listing among those statutes that do not regulate the business of insurance rules that concern *when* insurance companies may liquidate. We cannot agree with the implicit foundation of this argument, that any regulation of insurance liquidation is *per se* not a regulation of the "business of insurance." Rather, we find the better approach to be an independent assessment as to whether each facet of a challenged plan regulates the "business of insurance" under the *Pireno/ Royal Drug/ National Securities* trilogy.

As the parties have stipulated, it is beyond doubt that the provisions of the federal superpriority statute, 31 U.S.C. § 3713, are in direct conflict with Ohio Rev.Code

§ 3903.42. However, because the federal statute does not explicitly supercede McCarran–Ferguson, the state statute controls unless it was not enacted for the purpose of regulating the "business of insurance." Those courts that have considered whether an insurance liquidation priority statute may be considered a regulation of the "business of insurance" are split.

Only two federal circuit courts have addressed the precise question raised in this appeal, *State of Idaho ex rel. Soward v. United States*, 858 F.2d 445 (9th Cir.1988), *cert. denied sub nom. Fagiano v. United States*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989) and *Gordon v. United States Dep't of the Treasury*, 668 F.Supp. 483 (D.Md.1987), *aff'd*, 846 F.2d 272 (4th Cir.), *cert. denied*, 488 U.S. 954, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988). Both rejected the argument that the liquidation priority statutes before them regulated the "business of insurance," though on divergent grounds. Other courts have considered the issue as an ancillary matter and have come to a different conclusion. *Grimes*, 857 F.2d at 704; *Muir*, 792 F.2d at 364; *Levy*, 635 F.2d at 965; *Washburn*, 643 F.Supp. at 556. Because each case makes fundamental assumptions as to the nature of the "business of insurance" within the *Pireno/ Royal Drug/ National Securities* line of cases, we shall review the major decisions to facilitate our analysis.

The first case to squarely address the issue, *Gordon v. United States Dep't of the Treasury*, 846 F.2d at 272, demonstrates some of the controversies surrounding the *Pireno* analysis. *Gordon* involved a Maryland insurance liquidation priority statute which placed government claims at the same level with those of policyholders. *Gordon*, 668 F.Supp. at 486. The United States asserted priority status in the liquidation proceedings of a Maryland insurer under 31 U.S.C. § 3713. As State Superintendent of Insurance, Gordon sued claiming that giving priority to federal claims would invalidate a state law regulating the "business of insurance" in violation of McCarran–Ferguson.

The Maryland district court's opinion, which was adopted by the Fourth Circuit, applied the *Pireno* analysis and found McCarran–Ferguson inapplicable to the Maryland statute. The court rejected the abstention cases proffered by the Maryland Insurance Commission as authority that such statutes do regulate the "business of insurance" because none had applied the *Pireno* test. *Id.* at 489 n. 8. Stating, "[t]he risk that an insurance company will become insolvent ... is not the type of risk transfer emphasized in *Pireno* and *Royal Drug*[,]" the court found the liquidation statute failed the first prong of the *Pireno* test, whether the challenged statute facilities the transfer or spread of risk. More importantly, the court stated that summary judgment for the United States could be made on this basis alone because the first prong is "indispensable,"[3] *id.* at 490–91; although the court concluded by stating with little elaboration that neither of the other *Pireno* prongs were satisfied.

The Ninth Circuit addressed the question before us in *State of Idaho Ex Rel. Soward v. United States,* 858 F.2d 445 (9th Cir.1988). *Soward* involved an Idaho liquidation priority statute, Idaho Code § 41–3342, which is nearly identical to Ohio Rev.Code § 3903.42. The Director of the Department of Insurance for the State of Idaho sought judgment declaring that the state liquidation scheme prevailed over the federal superpriority statute because it was a regulation of the "business of insurance" under McCarran–Ferguson.

The Idaho district court agreed. *Soward,* 662 F.Supp. 60 (1987). The court found the liquidation priority scheme to be part of a larger administrative system for regulating of the entire life of domestic insurance companies. Relying on the abstention case of *Washburn v. Corcoran,* 643 F.Supp. at 554 (laws concerning winding up of insurance companies regulate the "business of insurance"), the court concluded that laws providing for the rehabilita-

tion, liquidation or dissolution of insurance companies are laws regulating the "business of insurance" exempt from federal legislation because, "[t]he right of the state to regulate and control the insurance company should include the right to manage its dissolution and liquidation as part of the overall regulatory scheme." *Soward,* 662 F.Supp. at 63. However, the district court did not apply the *Pireno* analysis.

On appeal, the Ninth Circuit reversed. *Soward,* 858 F.2d at 445. The court analyzed the liquidation priority statute under the *National Securities* definition of "business of insurance," stating

> Although ostensibly appearing to speak to the precise issue raised here, neither *Royal Drug* nor *Pireno* are necessary to decide this case. Both cases are refinements of the seminal analysis of *National Securities* tailored to address activities of insurance companies that would implicate the antitrust laws in the absence of the McCarran–Ferguson Act.

*Id.* at 452. The court found that the Idaho statute did not affect "the type of policy which could be issued, its reliability, interpretation, and enforcement" or protect the "relationship [of insured and insurer], directly or indirectly," because the regulation applies only to companies that are no longer in the business of insurance. *Id.* at 452 (quoting *National Securities,* 393 U.S. at 460, 89 S.Ct. at 568.) Therefore, the court concluded the only relationship regulated by Idaho is that of debtor and creditor, a relationship that is not protected by McCarran–Ferguson.[4] *Soward,* 858 F.2d at 452.

Although both the Fourth and Ninth Circuits have rejected the theory of Fabe's claim, he is not without authority for his position. A number of courts have abstained from exercising federal jurisdiction in cases involving state insurance liquidation priority schemes on McCarran–Ferguson grounds. *See, e.g., Grimes,* 857 F.2d at 699 (court abstains declaring recei-

---

**3.** The Fourth Circuit refused to consider the propriety of the district court's characterization of prong one as "indispensable." 846 F.2d at 274.

**4.** In dicta the court indicated that if it were to apply the *Pireno* test the liquidation priority would fail on similar grounds.

vorship regulations are laws concerning the "business of insurance"); *Levy*, 635 F.2d at 960 (court abstains in case involving conflict between state insurance liquidation statute and ERISA); *Washburn*, 643 F.Supp. at 554 (court abstains in conflict between Federal Arbitration Act and New York law regulating the liquidation of domestic insurance companies). These courts have determined that federal intervention into the complex administrative schemes developed by the states for the winding up of defaulting insurance companies risks damaging the delicate balance struck by state legislatures, who, acting pursuant to federal policy, are attempting to regulate a portion of the business of insurance which necessarily involves the adjustment of thousands of claims by policyholders against domestic insurers. *Washburn*, 643 F.Supp. at 556.

Though most of the abstention cases cited by plaintiff are weakened by their failure to apply the *Pireno* analysis, we do find these cases to be persuasive as to whether state regulation of insurance company insolvency and rehabilitation constitutes the regulation of the "business of insurance" within the meaning of the McCarran–Ferguson Act. One case, however, *United Services Auto. Ass'n v. Muir,* 792 F.2d at 365, does discuss the effect of the *Pireno* paradigm on insurance liquidation priority statutes. In *Muir,* a domestic insurer sought to enjoin the state insurance commission from revoking its license to sell insurance for its violation of a state regulation prohibiting mergers between insurers and financial institutions. *Id.* at 359–60 Relying on *Levy*, 635 F.2d at 960, the district court found that abstention was appropriate because the statute at issue was one regulating the "business of insurance" under McCarran–Ferguson, over which the states have exclusive control. *Id.* at 364.

The Third Circuit reversed. Applying *Pireno,* the court found abstention inappropriate because the anti-merger provision did not implicate the "business of insurance." However, the court distinguished its holding from those abstention cases in-volving insurance liquidation proceedings, which it felt met the *Pireno* standard.

The state regulations implicated in *Levy* concerned both the future coverage of policyholders and their relationship with a defunct insurer, and so were authorized under McCarran–Ferguson.... Unlike the regulations in *Levy,* the [merger] section is not concerned with transferring or spreading the policyholder's risk; [the merger section] has no integral connection to the relationship between the insured and insurer; and [the merger section involves groups that are] not entities within the insurance industry.

*Id.* at 364.

■ As our discussion has developed, we are confronted with a confusing mass of interpretations as to the term "business of insurance" which leaves basic, fundamental questions unanswered. Our starting point is the recognition that "[i]n the absence of the type of comprehensive federal regulation over insurance accorded the banking, securities and commodities industries, and because of the exclusion of insurance companies from the operation of federal bankruptcy law, 11 U.S.C. § 109, the states have assumed the primary role in regulating insurance," under the provisions of the McCarran–Ferguson Act. *Lac D'Amiante du Quebec v. American Home Assurance Company,* 864 F.2d 1033, 1039 (3d Cir. 1988). Accordingly, states have adopted a variety of regulatory mechanisms

[t]he emphasis [of which has] been placed simply upon protecting the little policyholder who cannot tell when he is charged too much for his insurance; since he does not investigate his purchase too carefully nor could he determine if a given insurer has the capacity, i.e. the solvency, to perform in the future when the insured event occurs, the States have established regulatory bodies to secure that necessary measure of protection.

Richards, *Insurance,* at 39. Thus if we apply a test of logic, Ohio Rev.Code § 3903.42 is a state regulation which protects the interests of the insured, and

therefore is protected from federal preemption as a law regulating the "business of insurance." Accordingly, the United States, as bond obligee, is not permitted to supercede the claims of superior creditors.

We find nothing in *Pireno* to suggest that its three part test should not be applied in the present case. Ohio Rev.Code § 3903.42 fulfills the *Pireno* requirements because it (1) transfers the policyholders risk of loss by insolvency at the time of contracting, (2) is an integral part of the relationship between insurer and insured, and (3) is exclusive in its operation to entities within the insurance industry.

■ Section 3903.42 has the effect of transferring and spreading a policyholder's risk that his insurer will become insolvent. By transferring that risk from the policyholder to the illiquid insurer or its appointed receiver and spreading that risk among all those policyholders and non-policyholders who are entitled to a statutorily specified priority, § 3903.42 meets the first prong of the *Pireno* analysis.

The United States argues that § 3903.42 does not spread or transfer a policyholder's risk at the time of contract, but merely provides a means of payment after the insured event occurs, and therefore is insufficient under *Pireno*, 458 U.S. at 130, 102 S.Ct. at 3009. We disagree. The provisions of § 3903.42 are exclusive in their operation and furnish a complete procedure for the protection of the rights of all parties involved, including policyholders with claims for covered losses, and policyholders who seek to recoup their investments. Ohio Rev.Code 3903.42(C). Accordingly, we find § 3903.42 is designed to support and undergird the entire contractual process between insurer and insured, as implicitly recognized by the parties, by transferring the risk of insolvency immediately upon contacting. Just as the regulatory scheme of the Federal Depositor Insurance Corporation regulates the business of banking for the protection of depositors, § 3903.42 regulates the business of insurance for the protection of policyholders. We feel the risk safeguarded against by such a statute is sufficient to qualify under *Pireno* for protection from federal preemption.

■ Although § 3903.42 transfers an insured's risk at the time of contracting, we cannot agree that this finding alone is sufficient to support a judgment for Fabe. *Pireno*, 458 U.S. at 129, 102 S.Ct. at 3008; *Cf. Gordon*, 668 F.Supp. at 490–91. The second *Pireno* criteria must also be met: whether the regulation at issue is an integral part of the policy relationship between insurer and insured. Unlike *National Securities, Royal Drug*, and *Pireno*, this case does not involve a third-party non-insurer seeking to avoid the provisions of federal law through the operation of the McCarran–Ferguson Act. Rather, it concerns a state law designed to protect the interests of insureds in their relationship with insurers by providing assurances as to the reliability and enforcement of the policies issued. *See National Securities*, 393 U.S. at 460, 89 S.Ct. at 568.

The United States asserts that § 3903.42 has no impact upon the policy relationship because it applies only to insolvent insurers no longer in the "business of insurance." *See Soward*, 858 F.2d at 452. We find this argument to misunderstand the nature of an insolvent insurer. Once an insurer is placed in receivership, only the sale of new policies is suspended during liquidation; the actual adjustment of claims and the payment of existing claims continue. The continuation of these activities, central to the "business of insurance," forecloses the United States' argument. *Pireno*, 458 U.S. at 134 n. 8, 102 S.Ct. at 3011 n. 8. Accordingly, because of its direct and substantial impact upon the policyholder, we find § 3093.42 constitutes an integral part of the policy relationship between insurer and the insured, satisfying the second prong of *Pireno*.

■ Finally, we find that § 3903.42 satisfies the third prong of *Pireno* because the priority scheme, by its own terms, is limited to entities within the insurance industry. Although the liquidation of an insurance company necessarily involves the claims of non-policied creditors, it is clear from the language and operation of § 3903.42 that

its focus is the protection of insureds by diverting the scarce resources of the liquidated entity away from any non-insured creditors, toward policyholders. *See National Securities*, 393 U.S. at 460, 89 S.Ct. at 568 (involvement of entities outside insurance industry impermissible where goal of regulation is not the protection of policyholders). The insurance liquidation priority scheme "need not be denied the § 2(b) exemption solely because" it also determines the rights of other non-policyholders. *Pireno*, 458 U.S. at 133, 102 S.Ct. at 30.

Because we find Ohio Rev.Code § 3903.42 satisfies all three prongs of the *Pireno* analysis, it is exempt from federal preemption as a regulation of the "business of insurance" within the McCarran–Ferguson Act. The judgment of the district court is reversed and the case is remanded for entry of judgment in favor of the liquidation of American Druggists' Insurance Company pursuant to Ohio law.

EDGAR, District Judge, concurring:

I concur that the application of the three-part *Pireno* test to Ohio Rev.Code § 3903.42 requires that it not be superseded by the federal superpriority statute, 31 U.S.C. § 3713(a)(1)(A). I also believe that the result reached by Judge Martin is compelled for other reasons.

The states have always presided over the liquidation of insolvent companies. The states did this for many years prior to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944). *See Motlow v. Southern Holding & Securities Corp.*, 95 F.2d 721, 725–26 (8th Cir.), *cert. denied*, 305 U.S. 609, 59 S.Ct. 68, 83 L.Ed. 388 (1938); *In re Peoria Life Ins. Co.*, 75 F.2d 777, 778 (7th Cir.), *cert. denied*, 296 U.S. 594, 56 S.Ct. 110, 80 L.Ed. 421 (1935). The states have continued to play this role. The federal Bankruptcy Code has never attempted to invade the province of the states in handling the liquidation of insurance companies.

Although Judge Martin has reached a different conclusion, I believe the purpose of McCarran–Ferguson was to restore the law to its status prior to *South–Eastern Underwriters*. As Justice Stewart said in *Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), "There is no question that the *primary* purpose of the McCarran–Ferguson Act was to preserve state regulation of the activities of insurance companies, as it existed before the *South–Eastern Underwriters* case." 440 U.S. at 218 n. 18, 99 S.Ct. at 1077 n. 18 (emphasis in original). *See Securities and Exchange Comm'n v. National Securities, Inc.*, 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668 (1969). It may reasonably be inferred, therefore, that Congress intended that long standing, traditional state regulation of insurance company liquidations continue unmodified by federal statute after the enactment of McCarran–Ferguson. Certainly there is no language in either McCarran–Ferguson or the federal superpriority statute which indicates otherwise.

In *National Securities* the "business of insurance," which was re-subjected to state regulation by McCarran–Ferguson, was described by the Supreme Court as follows:

> Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which *Paul v. Virginia*[, 75 U.S. [8 Wall.] 168, 19 L.Ed. 357 (1869),] held was not "commerce." The relationship between insurer and insured, the type of policy which could be issued, its *reliability*, interpretation, and *enforcement*— these were the core of the "business of insurance." Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed as protecting or regulating this relationship, directly or indirectly, are laws regulating the "business of insurance."

393 U.S. 453 at 460, 89 S.Ct. at 568 (emphasis added).

The Ohio liquidation statute prefers the claims of policyholders over those asserted by the United States government under the superpriority statute. The statute is thus aimed directly at the reliability of insurance policies purchased from Ohio insurance companies and with the enforceability of those policies. Even though the payment and adjustment of claims occurs after the insurance company is in the hands of a liquidator, this does not mean that the company is no longer in the "business of insurance." The Ohio statute is quintessentially a state law that relates to the regulation of the business of insurance.

NATHANIEL R. JONES, Circuit Judge, dissenting.

The majority correctly phrases the narrow issue presented to us for review as "whether the Ohio insurance liquidation priority statute is a state law regulating the 'business of insurance' within the meaning of the McCarran–Ferguson Act." Maj. op. at 343. In my view, however, the majority attaches too broad an interpretation to the phrase "the business of insurance", and as a result incorrectly concludes that Ohio's liquidation priority scheme is not subject to federal preemption. Such a holding fails to comport with relevant caselaw from other Courts of Appeals and the U.S. Supreme Court. I respectfully dissent.

Two other Circuits have already addressed the precise issue before us and have persuasively concluded that the liquidation of insolvent insurance companies is not "the business of insurance" within applicable Supreme Court precedent. In both *State of Idaho ex rel. Soward v. United States*, 858 F.2d 445 (9th Cir.1988), *cert. denied*, 490 U.S. 1065, 109 S.Ct. 2063, 104 L.Ed.2d 628 (1989) and *Gordon v. U.S. Dep't of Treasury*, 668 F.Supp. 483 (D.Md. 1987), *aff'd*, 846 F.2d 272 (4th Cir.). *cert. denied*, 488 U.S. 954, 109 S.Ct. 390, 102 L.Ed.2d 379 (1988), as in the instant case, a state's insurance authorities, in its capacity as liquidator or receiver for an insolvent insurance company, challenged the federal government's assertion of priority. In both these cases, directly on point with the

instant case, the priority of the federal government's claim was upheld. The majority concedes that the Fourth and Ninth Circuits have explicitly rejected Fabe's theory, yet reaches a directly opposite result based on abstention cases of questionable relevance and pure *ipse dixit.*

The majority emphasizes the scope of the Ohio liquidation statute. However, Ohio's ability to regulate the entire relationship between insurer and insured is not at issue. It is elementary that "[r]eorganization of insolvent insurance companies is a matter of state law and is handled through insolvency proceedings in state court." *Gordon*, 668 F.Supp. at 487. The federal government in this case only argues its priority in Ohio's liquidation of an Ohio insurance company, and does not seek to challenge Ohio's overall authority to regulate.

"[ ]In determining whether a particular practice is part of the 'business of insurance' ", three factors should be considered: "*first,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in itself[.]" *Union Labor Life Ins. Co. v. Pireno*, 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). The first prong of the *Pireno* test inquires whether Ohio's liquidation priority statute transfers or spreads a policyholder's risk. *Pireno* stated that "[t]he transfer of risk from insured to insurer is effected by means of the contract between the parties—the insurance policy—and that transfer is complete at the time that the contract is entered." 458 U.S. at 130, 102 S.Ct. at 3009. It is clear that, under *Pireno*, the transfer of risk has already been effectuated at the liquidation stage; therefore, any prioritization scheme instituted by the state of Ohio to govern liquidation of insurance companies has nothing to do with the transferring or spreading of risk within the meaning of *Pireno. See also Soward*, 858

F.2d at 454 ("The statute's assignment of priority to some creditors as against governmental entities does not transfer or spread policyholder risk"); *Gordon,* 846 F.2d at 273 (insurance commissioner's arguments fail to satisfy first prong of *Pireno* test because "the risk of insurer insolvency is certainly qualitatively distinct from the risk the policyholder seeks to transfer in an insurance contract.").

The majority envisions two kind of risk of loss. First, the policyholder transfers a risk of loss to the insurance company at the time the initial insurance contract is signed. The later transfer of risk of loss occurs at the moment an insurance company is liquidated and Ohio's Superintendent of Insurance is appointed as liquidator. Although Ohio's liquidation priority scheme may be characterized as a transferring a risk of loss to some extent, the ordering of creditors' claims does not effectuate a transfer of risk vis-a-vis the policyholder. The position that the liquidation of an insurance company effects a transfer of risk is directly contradicted by *Pireno:* "The transfer of risk from insured to insurer ... is complete at the time that the contract is entered." 458 U.S. at 130, 102 S.Ct. at 3009. The mere fact that Ohio's liquidation priority statute was enacted "for the protection of policyholders", maj. op. at 350, is irrelevant to the issue of whether the priority scheme has the effect of transferring a policyholder's risk under *Pireno.*

The second *Pireno* prong asks us to consider whether Ohio's prioritization statute is an integral part of the policy relationship between the insurer and the insured. The majority answers this inquiry in the affirmative solely because the payment of claims continues after the insurer is placed in receivership. This analysis, however, attributes to the liquidator rights which have already vested by virtue of the initial contract between the insurer and the insured. Simply because the insured's right to receive payment under the initial contract of insurance continues after the insurer is placed in receivership does not indicate to me that the statute at issue is "an integral part of the policy relationship between the [now-defunct] insurer and the insured."

458 U.S. at 129, 102 S.Ct. at 3008. The policyholder's rights and responsibilities are still governed by the original contract of insurance entered into with the insured. Rather than playing an integral role in the policy relationship between insurer and insured, Ohio's priority statute instead addresses "the relationship between those left in the lurch by the expiration of the insurer." *Soward,* 858 F.2d at 454. I am persuaded by the reasoning of the district court in *Gordon,* specifically adopted by the Fourth Circuit:

> [N]either the liquidation statute nor the priority statute are an "integral part" of the relationship between the insured and the insurer. The contractual liability to pay on a policy of insurance is obviously distinct from the question of who gets paid first. As with the claims adjustment process described in *Pireno,* the concern is whether a claim is paid, not why it is paid. *Pireno,* 458 U.S. at 132, 102 S.Ct. at 3010. Plaintiff contends that the priority statute does in fact determine whether a policyholder gets paid. The fallacy of plaintiff's argument is in his focus on the sufficiency of assets of the insurance company and its financial ability to pay rather than its liability for risks of loss as embodied in the contract of insurance. Whether the individual policyholder would be entitled to payment was determined when the contract was entered into; that is, when the risk was transferred, and not at the time of payment, if any.

668 F.Supp. at 491.

Under the third prong of *Pireno,* we must determine whether Ohio's priority statute "is limited to entities within the insurance industry." 458 U.S. at 129, 102 S.Ct. at 3009. This inquiry is easily resolved because this statute "govern[s] the rights of all creditors, not just policyholders." 668 F.Supp. at 491. "Creditors of all varieties have their claims assigned priorities by the statute, including the local, state, and federal governments." *Soward,* 858 F.2d at 454. The majority initially admits that an insurance company's liquidation encompasses non-policied creditors,

but nevertheless finds for plaintiff on this issue because the funds used to pay non-policied creditors may reduce the funds available to pay policyholders. Although ensuring that valid claims of policyholders are paid is an admirable goal, it is not relevant to our inquiry under *Pireno*. Indeed, were we writing on a clean slate I would agree with the majority that the concerns of the policyholders of a liquidated insurance policy should figure prominently in our analysis.[1] However, as a lower court, we are obliged to follow the dictates of the Supreme Court and to eschew broad public policy considerations, especially in this case where constitutional questions of due process or equal protection are not presented. Accordingly, because I believe that applicable law mandates the priority of the federal claim in this liquidation proceeding, I dissent.

---

1. The majority assertion that "it is clear" that the focus of Ohio's liquidation priority statute "is the protection of insureds", maj. op. at 350, is correct in the sense that Ohio's priority statute prioritizes the claims of policyholders above the claims of general creditors and claims of any federal, state, or local government. Ohio Rev. Code Ann. § 3903.42 (Baldwin 1989). However, there are two categories whose claims take priority over the claims of policyholders: (1) "[t]he costs and expenses of administration", and (2) "[d]ebts due to employees for services performed[.]" *Id.*